George **GREANIAS**, Plaintiff,

v.

**SEARS, ROEBUCK AND CO.**, Defendant.

No. 88 C 1367.

United States District Court, N.D. Illinois, E.D.

Aug. 28, 1991.

---

**463**

George Greanias, pro se.

Gerard Smetana, James Daffada, Richman, Lawrence, Mann, Greene & Smetana, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Pro se litigant George Greanias ("Greanias") sues his former employer Sears, Roebuck and Co. ("Sears"), charging that Sears terminated his employment in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. Sears now moves for dismissal under Fed.R.Civ.P. ("Rule") 12(b)(6)[1] or alternatively for summary judgment under Rule 56. According to Rule 12(b):

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . .

Because both parties have attached various exhibits and depositions to their briefs (and more importantly, because Greanias' Complaint—though it was self-prepared—is certainly legally sufficient on its face[2]), Sears' motion will be treated as a motion for summary judgment. For the reasons stated in this memorandum opinion and order, that motion is granted and this action is dismissed.

[1] Sears's motion also cited Rule 12(b)(1), but it has not even hinted at any basis for a lack of subject matter jurisdiction. That really reflects irresponsible conduct on the part of Sears' counsel. After all, such jurisdictional concerns must be addressed by a court, even sua sponte, whenever they are suggested by a party or by the court filings themselves. And where a party suggests the lack of subject matter jurisdiction without any good faith predicate for doing so, the court is sent on a chase after a will-o'-the-wisp—in this case wholly on its own, given Greanias' lack of legal representation.

[2] What has been said in n. 1 about the lack of responsibility on the part of Sears' lawyers as to the purported Rule 12(b)(1) motion is true on the Rule 12(b)(6) phase of their motion too.

### Facts [3]

Greanias was born on May 5, 1929. He received a Bachelor of Arts degree from James Milliken University and then the postgraduate degree of Masters in Business Administration from the University of Pennsylvania's Wharton School of Business. Greanias also took several computer courses at the New York University Graduate School of Business.

From 1955 to 1961 Greanias worked for Shell Oil Company administering credit card accounts; from 1962 to 1966 he was a market analyst for Campbell–Mithun Advertising Agency; from 1966 to 1968 he worked as a researcher for IBM; from 1968 to 1970 he served as a research director for Allen, Anderson, Niefeld & Paley Advertising Agency; from 1970 to 1972 he worked at Clinton E. Frank, Inc., supervising all advertising for Motorola; then he returned to Campbell–Mithun from 1972 to 1975; and thereafter he held two different jobs in marketing research for about six months each and worked at Marketing Information Services from 1976 to 1977. Sears hired Greanias on August 8, 1977 as a research analyst in its advertising department, an entry-level position. At that time he was 48 years old.[4]

As part of Sears' initial screening process for hiring, Greanias took a battery of tests on which he performed extremely well. This was the conclusion reached under the category "OVERALL MENTAL ABILITY AND DECISION MAKING" (P.Ex. 25(a) [5]):

> Mr. Greanias's overall mental ability is highly superior compared to other Sears executives. He can be expected to handle the intellectual aspects of any executive-level assignment with great facility, and possesses the exceptional mental flexibility necessary to deal effectively with extremely complex and abstract material.

His quantitative skills were rated "above the average for the Sears executive population" (id.) and his level of verbal skill was described as "exceptionally high" (id.). Other comments were equally glowing and complimentary, such as: "profit oriented" (id.) and (as part of the same evaluation, but labeled by Greanias as P.Ex. 25(b)) "usually serious and careful but is capable of flexibility," "friendly and outgoing," "readily accepting a leadership role," "extremely fair-minded and tolerant toward others and will cooperate wholeheartedly in team efforts," "extremely objective and dispassionate and does not become emotionally involved in situations," "extremely optimistic" and "very confident under almost any circumstances." On the potentially negative side was only this (id.):

> A very agreeable person, he will go out of his way to avoid friction or animosity. He will try to get along with everyone and may at times back down on his own opinions and ideas in order to avoid confrontation. He is likely to have difficulty disciplining subordinates.

Although Greanias' title changed from research analyst to marketing analyst to merchandising analyst during his 8½ years at Sears, the nature of the work remained the same and all of the positions were entry-level positions. Hierarchy in Sears' management began at one of the entry-level positions and progressed to project director and then to area or section manager and finally to department manager, and the normal course of promotions would oc-

---

**3.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted)) in the light most favorable to the nonmovant—in this case Greanias.

**4.** As mentioned later in this opinion, Greanias had previously applied for a position at Sears in 1971 but was not then hired.

**5.** Each party has tendered statements of fact in support of and in opposition to the Rule 56 motion in accordance with this District Court's General Rule 12(m) and 12(n) (those statements are respectively cited "D. 12(m) ¶—" and "P. 12(n) ¶—"). For simplicity, exhibits attached to those statements will be referred to as "P.Ex.—" and "D.Ex.—".

cur in that same order. Greanias was never promoted at all.

Greanias began his employment at Sears as a research analyst in the advertising department known as Department 732A. He described his work this way (Greanias Dep. 63):

> Well, we studied the effects of 15- and 30-second commercials and the length of copy and print advertisements and whether the eye movement of people as they read magazine or newspaper ads— in some instances people used cyclojobinometers to measure fingertip response to stimuli and such, that kind of thing. That's mostly gadgetry, what people recalled from advertisments [sic], either print or television, what they remembered, what they liked, what they didn't like, things like that.

During his years in Department 732A Greanias received annual performance evaluations from his superiors (P. Exs. 6A, 7A, 9A) and was given these overall ratings: "Competent" in 1978, "Very Good" in 1979 and "Very Good" in 1980.[6]

About 1980 Department 732A was absorbed by the merchandising research department known as Department 720MR.[7] Donald Hughes ("Hughes") was the departmental manager. Greanias described the main difference between the two departments as "a difference in philosophy" (Greanias Dep. 62–63):

> [W]hen we were in 732, Mr. Scidner [sic—should be "Seidner," then Greanias' departmental supervisor] was a person who wanted to keep expanding the frontiers of advertising research, because it was his paramount interest. And 720MR, it was only part of a bigger whole, so it wasn't as all encompassing. And when we got to 720MR, it—well, for economic reasons, too, the pushing the frontiers kind of thing came to a screeching halt, because they had to use the money for other things. But in terms of internal operating, I think there were more rules and procedures in the bigger department, understandably, then [sic] there would be in a smaller department.

Department 720MR provided in-house marketing services to various merchandising departments of clients under the Sears corporate umbrella, such as Coldwell Banker and Sears Optical.

In his April 1981 performance evaluation (P.Ex. 9E) Greanias' section manager John Wiese ("Wiese") rated Greanias "Very Good" overall. Wiese also said:

> George and I believe that his contributions to the corporation could be enhanced if he had a broader perspective of the company (such as could be provided

---

**6.** Sears conducted annual reviews of all of its employees paid by check. Dubbed the "Sears Managerial Review Program for Headquarters," it was designed to enable the employees, with the assistance of their immediate supervisors, to grow in the job and attain increasing levels of responsibility (see D.Ex.J). Performance categories rated were technical knowledge, knowledge application, administrative effectiveness, work relations, response to superiors, directing subordinates, personal commitment, source (supplier) relations and "overall". Although "competent" is nowhere defined in the Sears' materials, the other performance level definitions were, from highest to lowest (D.Ex.L at h):

> *Distinguished.* Reserved for those few whose performance is clearly and consistently distinguished: far exceeds expectations of what is required, or should be accomplished. Demonstrates a very high level of expertise: serves as a model of excellence.
> *Outstanding.* Performance is clearly and consistently above the level expected of a Sears executive. Clearly exceeds expectations of

what is required. Outstanding, consistently effective executive performance.
> *Very Good.* Meets the high standards of performance expected of a Sears executive. Consistently dependable, does the job as it is supposed to be done. Fully meets and sometimes exceeds performance requirements.
> *Good.* Performance is good. Generally acceptable. Usually meets the expected level of executive performance. Some improvement may be desirable.
> *Fair.* Performance is fair. Comes close to meeting the acceptable level of performance or accomplishment expected of a Sears executive. Some improvement is necessary.
> *Poor.* Performance frequently fails to meet requirements of acceptability. Falls below the level of performance expected of a Sears executive. Inadequate to the extent that improvement is necessary.

**7.** Although the parties refer to the department as "720MR" in their briefs, it may appear as "720R" in quotations because various managers referred to it in that way.

by attendance at Staff School) and a broader perspective of consumer research (such as could be provided by attendance at D/72OR CROP course). In addition, George could help to develop new projects and programs for the Division through his contacts—past and future—with our client departments.

Below that statement Hughes wrote "Staff school is currently on 'hold.'"[8] In addition, below Greanias' own statement in that same evaluation that he would like to attend Staff School to broaden his knowledge of the company and to identify possible career goals, Hughes wrote, "Suggest George see Ron Keller about possibilities outside of D/72OR."

In 1982 Hughes began to review Greanias' performance regularly (Hughes Aff. ¶ 4). In January 1982 Hughes wrote Greanias a corrective memorandum—a document issued according to the procedures of a Sears policy on correction of employee deficiencies (see D.Ex.M). Hughes expressed several concerns (this is a paraphrase of part of D. Ex. I):

—a "disturbing" pattern of absences due to illness over the past three years that appeared tied to weekends and rarely occurred on a Wednesday;

—frequent and prolonged personal telephone conversations;

—time spent in the department library reading irrelevant publications;

—excessive absences and irregular hours of attendance;

—low productivity because of lack of initiative in getting assignments in a division with "falling budgets and surplus personnel."

Hughes concluded (*id.*, quoted verbatim):

Your first priority is to correct the situation described above. In addition I think you should give some thought to your future. I question whether your choice of research as a career was a wise one based upon your record with Sears and the industry prior to joining Department 732A. You may wish to redirect your efforts.

In February 1982 Wiese rated Greanias "Good" overall in his performance evaluation (D.Ex.E at e)—a dropdown of one level from the "Very Good" ratings that Greanias had received from 1979 through 1981.

From April 1982 to 1985 Greanias was assigned to the Sears T.V. Commercial Test Panel Research Program ("Test Panel"). Greanias was responsible for analyzing the performance of a particular commercial and for preparing a report that provided conclusions and recommendations in order to determine the commercial's level of performance for the target audiences. Greanias' findings were drawn from computer-generated data that analyzed viewers' perceptions.

In May 1982 section manager Jim Rys ("Rys") repeated Greanias' February overall rating of "Good." Among Rys' comments were these (D.Ex.E at b):

George's first draft of accountabilities was nebulous. He didn't understand what was expected of him. Now he does. His work is clearly defined, more structured, and easily monitored and assessed. He claims that it is more absorbing and rewarding too.

George has listed everything he did during 1981. I judge the Black Consumer Campaign Study as his most significant accomplishment. It uncovered a talent for writing which is being nurtured on the TV Commercial Test Panel. He has been disciplined in the past year, and is a more critical and careful worker as a result.

George's work habits over the past year have been severely criticized, and rightly so. Most aggravating to everyone has been his irregular attendance and his inability to conclude or start anything without considerable cajolery. The work of others is disrupted because they must be involved to head off disaster. Since starting work on the TV Panel at the

---

8. Sears Staff School was a program in which representatives of each of the departments at Sears gave a presentation to improve communications within Sears in order to identify to those in attendance their part in the continuing dynamics of Sears as a successful corporation (Hughes Aff. ¶ 7).

beginning of April his attitude and productivity have improved dramatically. Obviously the disciplined environment helped.

On that evaluation Hughes merely wrote, in response to Greanias' stated goal of promotion to Project Director (*id.*):

George has a long way to go in achieving departmental standards in current assignments. Project Director is not in sight.

In 1983 Rys rated Greanias as "Fair" overall—a continuation of Greanias' deteriorating evaluations [9]—and commented (D.Ex.F at b):

He needs to sharpen his analytical abilities on the panel, and to assist Project Directors whenever he can in order to achieve greater responsibility. His discretion is now quite limited.

Although George is more fully occupied and more sensitive to deadlines than he once was, what he has turned in has been persistently substandard. He needs to spend more of his workday doing his job better and less of it on other things. George's work on the TV Panel exposed technical shortcomings and carelessness not evident before. New procedures should mitigate these failings. In addition, George has promised to curtail actions or family and personal interests during working hours. In the past these preoccupations have disrupted others and hurt the division's morale. Last year George's "some improvement necessary" performance deteriorated further. He is resolved to begin turning it around now.

For his part, Hughes wrote a memorandum to Greanias simultaneously with the 1983 review, placing Greanias on 90–day probation. After he commented (1) that pursuant to the 1982 corrective letter Greanias had discontinued the habit of taking sick leave in conjunction with weekends and (2) that Rys said Greanias' work habits had improved, Hughes stated several reasons for placing him on probation (again this is a paraphrase of D.Ex.H):

—his habit of taking days off without warning;

—technical shortcomings and carelessness in work on the Test Panel by trying to justify senseless statistics and making errors to an unacceptable degree;

—clients' lack of respect for him: "Your credibility with them has deteriorated through bad experiences working with you and may already be past redemption."

—preoccupation with family and personal interests, particularly phone calls, messages and errands that were disruptive because they impinged on coworkers.

Hughes warned Greanias that his performance must improve during the probationary period or he could be terminated.

Several months passed. Then in September 1983 Hughes wrote Greanias a letter ending the probation (D.Ex.Y):

Your work habits and the quality of your writing have improved during this period to the point that I would not recommend termination of your employment with Sears at this time.

However, you have a long way to go in becoming a valued employee in this Department. Your limited skills and past unsatisfactory performance reputation makes it currently impossible to move you into other positions in the Department where heavier workloads exist.

In 1984 Rys gave Greanias his second annual "Fair" rating overall, including the following comments (D.Ex.G at b):

Unfortunately during 1983 he failed to deliver as expected. His work was inconsistent in quality and rarely on schedule. For now, he must clear all his work through me.

Although the quality of George's work improved for a limited time, he failed to sustain those improvements. George must maintain schedules and do more and better work while again on probation.

**9.** In the space of just two years, then, Greanias had slipped two full levels, from "Very Good" to "Fair." And importantly (as the later discussion will reflect), the new substandard evaluation was made by a supervisor other than Hughes.

Hughes wrote Greanias a correctional memorandum on April 17, 1984 at about the same time as the review, first referring to the series of "Fair" ratings from two different managers and then once more citing a problem with sick days as an overall concern (D.Ex.K at a):

> Your use of sick days over the years has been at a level which on a timecard employee's evaluation would automatically call for an "Unacceptable" evaluation for adherence to Company policies and procedures. Reviewing your history (and keeping in mind that the average male in this department has about five sick days per year) we see:
>
> 1978—Sick nine days
>
> 1979—Sick twenty days
>
> 1980—Sick seventeen days
>
> 1981—Sick twelve days
>
> 1982—You were home sick two days in early January and shortly thereafter I reviewed your illness record with you and pointed out that an unusual number of days were taken in conjunction with weekends. The essence of that conversation was confirmed in the written corrective given to you on January 21, 1982. For the balance of the year you had no sick days which I consider a remarkable return to health.
>
> 1983—The pattern returned with 16½ days of sick leave taken but with a greater scattering across the days of the week.
>
> 1984—To date you have taken eight days of sick leave and were that pattern to continue for the balance of the year it would project to 31 days of sick leave for 1984.

Hughes went on to show by using a table that the majority of sick days were taken as one or two day absences and wrote (*id.* at b):

> I can only conclude that staying home for a day or two on the slightest provocation is a way of life with you that was only temporarily reversed after your corrective in 1982.

Hughes then moved his criticism from attendance to the quantity and quality of Greanias' work. Hughes said that when he had met Greanias in 1980 upon taking over the department, Greanias was able to produce only one report that he had written in the past year. In 1981 he completed only three. Then in 1982 Greanias analyzed results in over 100 commercials, but most of his reports required extensive revision. Hughes said Greanias produced fewer than 50 reports in 1983. Finally Hughes criticized him for falling behind schedule. Hughes concluded by placing Greanias on another 90–day probation, warning that he would be terminated if he did not improve (*id.*):

> There is no room in this Department for "Fair" employees.

Greanias wrote a memorandum to Personnel Director Jack Fitzsimmons ("Fitzsimmons") in June 1984, explaining that during the current probation he had been assigned extra work not part of his formal research assignments from Hughes and that it had taken away from his Test Panel work. That extra work involved reducing six file cabinets of reports to three by deciding whether to keep them, destroy them or send them to storage. Greanias wrote that was not unlike a previous experience he had under Wiese, when he spent eight months going through disorganized mounds of old reports sorting them and was given no other assignment during that period (P.Ex. 17).

On June 4, 1984 Hughes wrote Greanias a progress memorandum (D.Ex.AA), stating that his attendance had improved but that Rys said that Greanias was away from his desk too much on personal errands; that Greanias did complete nine commercial reviews in the first three weeks that were submitted on time; and that Rys rated the quality of Greanias' work as still "Fair" and needing improvement. Finally Hughes noted that the quantity of work assigned to Greanias during this period was below standard and that he should look to increase it. Hughes said that Greanias' next review would be on June 18. However, there never was another review or letter formally ending the probation.

At some point during the probationary time periods Greanias wrote three different

reports for the Test Panel that have been highlighted during this litigation. Each of those reports analyzed the data of audience response to a commercial spot and summarized the analysis in the section known as "conclusions and recommendations." Greanias testified that the usual process of writing such reports involved a great deal of editing by others such as Rys, so that Greanias retyped it over and over until much of it was no longer his own (Greanias Dep. 167).

Project director Tony Cash ("Cash") gave line-by-line written critiques of each report, and his comments were generally negative. Repeated themes were that Greanias had not paid attention to the data in reaching his conclusions, but rather made his own assumptions, and that he had not given recommendations. Cash often disagreed with Greanias' interpretation of the data. Greanias admits that such criticism was typical from Cash as well as from Rys (Greanias Dep. 377). However, Rys wrote in a June 5, 1984 memorandum to Greanias (D.Ex.D at a–b):

> I don't appreciate the way you threw these at me and ran. Use your head. I've discussed these with Tony. Some of these criticisms are valid and corrective actions should be taken, but others aren't and you could and should defend your work....
>
> P.S. With just the few revisions I've inked on the top analysis, I think it's defensible, the others may be more difficult, and I didn't have the time to tackle them.

Greanias recalls that "these" in the first sentence referred to those same three reports and that they were being scrutinized for the purposes of his probation (Greanias Dep. 172, 184–85).

In October 1984 Hughes wrote a memorandum (D.Ex.BB) to section manager Steve Wolf ("Wolf"), stating that Hughes had spoken to Greanias about his being late three days in a row and that Greanias blamed it on his teeth that were troubling and weakening him. Hughes wrote that Greanias was still under the terms of his last corrective and asked that Wolf keep him informed of Greanias' "level of contribution."

In 1985 Greanias received his annual review from Wolf, who also rated him overall as "Fair"—the third consecutive evaluation at that subpar level. Wolf commented (D.Ex.L at b):

> George has been in research many years, and I am inclined to feel that the core issue is not so much job knowledge or innate ability as consistent and persistent self-application. This inevitably relates to the company policy problems noted in correctives. George has indeed been a most cordial, amiable group member who has repeatedly expressed interest in the Division's work. The challenge is to translate that interest into a solid long-term record of achievement. A mind-set devoted to consistently superior performance is the essential element in meeting that challenge.

Wolf also stated that Greanias was now in a more clerical "support" role within the job description of market analyst and that he needed to show improvement in four areas—deficiencies of which there were "sufficient instances over time, in the light of performance by others in the Market Analyst role, to generate anxiety"—before he could be given greater responsibility (*id.* at c):

> (1) more thorough attention to accuracy and completeness in detail work;
> (2) more timely production and greater volume of work;
> (3) data presentation and analytical content focused more directly on project objectives;
> (4) more independent operation (frequent requests for guidance on details being a common pattern).

Hughes attached his own comments to Wolf's review (*id.* at d):

> Steve Wolf is the third Division Manager in a row to evaluate George as "Fair." Each of these three managers had many years of experience and, based upon numerous reviews that they have submitted, I have no reason to believe they are unfair or lack the ability to judge various levels of performance.

Obviously George's performance has lacked a great deal over the years.

He went on to say that Wolf's heavy workload gave him little time to spend policing Greanias but that Wolf was nevertheless willing to try. Hughes then concluded:

This situation must be resolved. Either George turns into a producer commensurate with his position or he finds some other position outside of this Department. He is a drain on managerial time and the morale of those who observe his work habits.

In November 1985 Frank Tuma ("Tuma") of Department 702M, who reported directly to the Sears Merchandising Manager, sent a memorandum to Greanias on his presentation of research results (P.Ex. 14):

Confirming our phone conversation, I really appreciate the contribution you made to the gift certificate overview last month with Messrs. Johnson and Hofrenning.

You really have a lot of ideas and know how to tie the whole thing together. It was very good to have your insight.

Tuma copied the letter to Hughes and Wolf. In April 1986 (after he had been terminated) Greanias also received a memorandum from Sears National Manager of Incentive Sales Jerry Hofrenning ("Hofrenning"), for whom Greanias had done research while in Wolf's section. Hofrenning stated (P.Ex. 15):

Good seeing you on Sunday. Give our regards to your wife. Hope everything goes well with you. You may use me as a reference anytime.

In January 1986 Wolf again rated Greanias overall as "Fair" (D.Ex.L at g). Four straight evaluations at that level proved fatal. Hughes decided to terminate Greanias and on February 14, 1986 wrote a letter to Fitzsimmons stating his reasons (D.Ex.CC): [10]

1. *Quality of Work.* [Hughes attached an example of one of the reports that was rewritten and stated that in another assignment Greanias was unable to calculate a median]

2. *Unacceptable Ratings.* [Here Hughes cited the repeated "Fair" ratings]

3. *Failure to Improve.* Despite a number of written correctives and verbal warnings, George has not made significant improvement in his output or in his work habits.

4. *Inability to Maintain a Consistent Work Pace.* ... Reading magazines at his desk or newspapers in the Library are favorite diversions. He lacks the ability to work on an assignment for extended periods of time.

5. *Tardiness.* George selects his own starting and quitting times, as we all do. However, he is often late in arriving but rarely late in leaving.

6. *Impact on Morale of the Department.* Other employees who observe George's output and work habits cannot help but wonder how much the organization will tolerate.

7. *Impact on the Flexibility of Department Administration.* ... No manager will take George freely. They would prefer to leave a spot open rather than fill it with George....

George is not salvageable as a productive employee in Department 720R. It is time that he leaves.

Greanias was officially terminated on February 17, 1986 when he was 57 years old. His termination notice reiterated the same reasons as stated above (see D. 12(m) ¶ 154).

On March 5, 1986 Fitzsimmons sent Greanias a letter stating that Greanias had turned down this offer from Sears (P.Ex. 19a):

[W]e gave you an opportunity for outplacement service paid for by Sears, as well as salary and benefit continuation through May 15, 1986, and then voluntary resignation. In turn, we asked you to release Sears from any claim or ac-

---

10. What follows in the text is obviously a summary rather than the entire letter, with brackets reflecting this Court's language and ellipses indicating (as always) omissions of portions of Hughes' language.

tions resulting from your employment with or termination from Sears.

Then on March 14, 1986 Greanias signed a form entitled "Reason for Leaving" that cited the reason as "Unsatisfactory performance—production quantity and/or quality of work" (D.Ex.DD). But before he signed, Greanias crossed out the word "voluntary" and substituted "involuntarily" in a sentence in small print above his signature that had originally read:

> I have been informed and understand that as a result of voluntary [sic] discontinuing my employment with Sears Roebuck and Co. my continuous service and benefit participation with the Company ceases.

Greanias had received increases in his salary between 1978 and 1982 to maintain his salary in the midpoint range.[11] However, he did not receive any salary increase from 1982 to 1985, except for one in 1985 given only because his salary had then dropped below the base point. For the years 1983, 1984 and 1985 Greanias' salary was below the midpoint range for his position. Upon termination his annual salary was $28,620.

Greanias' termination occurred approximately 1½ years before he would have been eligible for fully vested retirement benefits. Among involuntary terminations occurring at Sears of employees who were paid by check, 8 of 9 in 1984 were of employees age 40 and over, 7 of 12 in 1985 were of employees age 40 and over and 5 of 10 in 1986 were of employees age 40 and over. During those three years Greanias was the only employee over 40 who was terminated before his or her retirement benefits had fully vested.

Greanias' position was not filled upon his leaving, at least in the sense that no one continued the tasks to which he had been assigned under Wolf. But there were entry-level market analysts, hired later in the Department, who may have been under the age of 40 (Hughes Aff. ¶¶ 14, 15, 16).

On December 17, 1986 Greanias filed a charge of age discrimination with the Equal Employment Opportunity Commission. Then and thereafter he complied with all the jurisdictional preconditions to filing this action.

### Applicable Legal Framework

There are now two essentially different frameworks through which an employee may prove that he or she was discriminated against on the basis of his or her age. One is the mixed-motives analysis announced in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989),[12] appropriate when both legitimate and illegitimate considerations played a role in an adverse employment decision, and the other is the familiar ping-pong approach dictated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) as rearticulated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), appropriate when "*either* a legitimate *or* an illegitimate set of considerations led to the challenged decision" (*Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1789 (emphasis in original)).

If a plaintiff has *direct* evidence of age discrimination, *Price Waterhouse* immediately comes into play—for if the plaintiff can sustain his or her initial burden of proof on that score, the burden of proof ultimately shifts to the employer and the plaintiff need not rebut the employer's claim. On the other hand, the "entire purpose" of the *McDonnell Douglas/Burdine* framework is "to compensate for the fact that direct evidence of intentional discrimination is hard to come by" (*Price Waterhouse*, 490 U.S. at 271, 109 S.Ct. at 1801

---

**11.** Sears established a salary range for each position and ranked the amounts in the range in three levels—base, midpoint and ceiling. Increases in pay within that range were given based on the employee's position in the range, the employee's performance and salary units available from increased funds.

**12.** *Price Waterhouse* was a Title VII case, but its approach has been held applicable to ADEA cases as well (*Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 658 (7th Cir.1991) (en banc)).

(O'Connor, J., concurring)). Hence it is normally triggered by a plaintiff's lack of direct evidence—and in that event the plaintiff sustains the burden of proof throughout.[13]

What that means in terms of a summary judgment motion in a case such as this one, where the plaintiff proffers any direct evidence of age discrimination, is that this Court should first determine whether Greanias has created a genuine issue of material fact under the mixed-motives analysis of *Price Waterhouse*. Because that inquiry gets a negative answer as a matter of law, only a word will then need to be said as to the *McDonnell Douglas/Burdine* approach.

### PRICE WATERHOUSE *Direct Method*

■ *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1794 described the route to be traveled in an employment discrimination case when the employee has proffered direct evidence of discrimination:

> We hold that when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account.

Focusing on the plaintiff's initial burden, the same opinion had earlier elaborated (*id.* at 250, 109 S.Ct. at 1790):

> In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman.

But it must be remembered that the just-quoted opinion was that of a four-Justice plurality, so that the majority ruling depended upon the concurrence of Justice O'Connor or Justice White or both. Hence the term "motivating part" must be read as requiring the unlawful motive to have been a *substantial* factor—not just *a* factor—in the adverse decision (*id.* at 265 and 259, 109 S.Ct. at 1798 and 1795).

Greanias offers three pieces of what he perceives as direct evidence that age was a motivating part of the decision to terminate him:

1. He was fired 1½ years before his retirement benefits would vest.

2. Cash once told Greanias he was "too old for this work" (Greanias Dep. 114).

3. Hughes once said to Greanias, "George, you and I are both too old to learn anything knew [sic]" (*id.* 115).

Each of those items of evidence requires analysis.

■ As to the first, *Visser* is dispositive. Although that case acknowledged that a denial of pension benefits could be a form of age discrimination, it held that a pre-vesting termination in and of itself was not enough to call for an inference of such discrimination, even assuming the employer's knowledge of the imminent vesting (924 F.2d at 658–59). Without some evidence that the employer was purposefully availing itself of the opportunity to cut costs, the mere fact that Greanias was denied his benefits is not direct evidence of age discrimination (*id.;* contrast *Metz v. Transit Mix, Inc.,* 828 F.2d 1202, 1207–08 (7th Cir.1987)).

■ As for the second item of evidence, Cash's comment: If that statement was truly made (as must be assumed on the current motion), it could well have generated the necessary inference of an age-based firing if it had been Cash himself who triggered that firing. However, the lesson of *LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1412 (7th Cir.1984) is clear: No discriminatory comment made by someone other than the decisionmaker can provide the necessary dem-

---

**13.** Burden of proof should not be confused with the burden of production (often termed the "burden of going forward"), a burden that does shift in the *McDonnell Douglas/Burdine* analysis.

onstration of age discrimination. Here Cash had no formal input into the managerial review process, for he did not play a direct role in the performance evaluations (Cash Aff. ¶ 18). It is true that Cash was Greanias' project director for a time and critiqued his reports, but Greanias provides no evidence that Cash played a part—either formal or informal—in the decision to terminate him.

By contrast, Hughes' comment (which is also accepted here as having been made) came directly from the mouth of the decisionmaker. That might perhaps lead a trier of fact to conclude that age played a motivating part in Hughes' decision to terminate Greanias.[14] It will be recalled that Hughes did not originally hire Greanias— Seidner did. In fact, Hughes had turned down Greanias when he had applied to Sears in 1971 (P.Ex. 2). Then after Greanias had been hired by Seidner, it was not until 1980 that Greanias came within Hughes' authority. In 1981 Hughes rejected without explanation Greanias' and Wiese's stated desire that Greanias attend Staff School. Finally, Greanias says that in 1983 or 1984 he asked Hughes why he could not go to Staff School if Hughes thought his performance was so deficient, to which Hughes responded, "George, you and I are both too old to learn anything new."[15]

■ Greanias must be able to show a causal connection between the point of view manifested by that statement and Hughes' decision to terminate him (*McCarthy v. Kemper Life Insurance Cos.*, 924 F.2d 683, 686–87 (7th Cir.1991)). It is true that Hughes' alleged statement was made two to three years before Greanias was terminated, but there is no requirement that a comment must be made at or close to the time of termination to be considered direct evidence of discrimination (though *McCarthy, id.* at 687 did refer to a similar time lag as one factor in determining that a racial slur by a non-decisionmaker was "not evidence of a discriminatory employment decision"). Any such requirement would be too strict, for employers do not so frequently evidence their biases with bald statements. Employees must necessarily take full advantage of such statements if and when they are made.

■ Nor is the issue of possible age bias eliminated by the fact that Hughes himself was one or two years older than Greanias. As *Visser*, 924 F.2d at 658 put it, an employer who was also older might still discriminate in that he "might of course exempt himself from infirmities that he believed afflict the rest of his age group." Indeed, Greanias' contention is that Hughes had a youth bias.[16]

■ And so, even though it may well represent a stretch to do so, this opinion will assume "that, if we asked the employer at the moment of decision what its reasons were and if we received a truthful

---

**14.** What follows in this paragraph of the text is very narrowly focused, adverting only to the few matters that might arguably lead to an inference of the impermissible consideration of Greanias' age as having factored into Hughes' adverse decision. It ignores for the moment the massive amount of evidence that runs against Greanias and is wholly unrelated to his age. At this point Greanias is being given the benefit of the doubt simply in order that the *Price Waterhouse* analysis can be undertaken.

**15.** Sears' response (as might be expected) is to deny flatly that the statement was made and to say that only persons who were performing above average could attend Staff School (Hughes Aff. ¶ 9). However, as to the latter, in 1981 (when Greanias first requested to go) he had received an evaluation of "Very Good" overall and was still turned down. As to both that explanation and Hughes' denial, those are cer-

tainly issues that would have to be resolved by a finder of fact. On the current motion, then, Greanias' version will be accepted.

**16.** Greanias produced a memorandum from Hughes to the Department about an upcoming blood drive where Hughes stated (P.Ex. 12):

> Since Department 720R, on the whole, is younger, healthier and more conscious of and responsive to community needs than the average department in Sears I expect that we'll probably lead the Tower in percentages of pledges obtained.

Although such a statement could of course be innocuous, *Shager v. Upjohn Co.*, 913 F.2d 398, 402–03 (7th Cir.1990) tells us that such statements should be taken as part of the whole, along with directly discriminatory statements, and that inferences to be drawn from them ought to be left to the trier of fact.

response, one of those reasons would be that the ... employee was [an older person]" (*Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. at 1790, adapted to an ADEA claim). But even on that unduly favorable assumption, in this case it must be concluded—notwithstanding the most reasonable pro-Greanias inferences—"that it would have made the same decision even if it had not taken the plaintiff's [age] into account" (*id.* at 258, 109 S.Ct. at 1795, similarly adapted).

What all the facts portray, sadly, is someone of real potential—as evidenced by Greanias' 1977 performance on the battery of tests when he was first considered for hiring by Sears—who not only failed to meet that potential but who actually deteriorated in performance to the point at which his employer terminated him for reasons that clearly had nothing at all to do with his age. For that purpose we need look only with an unjaundiced eye at Greanias' unraveling as it was consistently seen by his supervisors—not just by Hughes, who made the ultimate firing decision, but by the other immediate superiors for whom Greanias worked and who rated him.

Because the *Facts* section of this opinion has set out the sequence and particulars in such detail, they will not be repeated here. Suffice it to say that Greanias' decline from "Very Good" to "Good" to "Fair" in two years, followed by three more annual evaluations at that subpar level, fully supports Hughes' acting on his earlier warning (Deft.Ex.K at b) that:

> There is no room in this Department for "Fair" employees.

Moreover, those adverse appraisals were made by two different section managers, Rys and Wolf, wholly separate and apart from Hughes' critical comments. Each of them identified serious deficiencies in Greanias' performance, totally at one with Hughes' contemporaneous evaluative comments. At the time of Hughes' 1985 review, when he said in part "This situation must be resolved"—fully a year before he actually proceeded to fire Greanias—Hughes specifically pointed to that series of direct management reviews that had found Greanias was rendering no better than "Fair" performance. Under the totality of circumstances presented by the record here, it would distort matters impermissibly to label Greanias' age as having any degree of causal relationship to his firing as called for under *Price Waterhouse*.

This Court is of course well aware of the principle announced by our Court of Appeals in *Adler v. Madigan*, 939 F.2d 476, 479 (7th Cir.1991) (citation omitted):

> "Mixed motives" situations are ordinarily not grist for the summary judgment mill.

But *Adler* itself demonstrates that "ordinarily" does not mean "always." And in this case (just as in *Adler*) there is no genuine issue of material fact—Sears is entitled to a judgment as a matter of law that it would unquestionably have made the same decision to terminate Greanias even if Hughes had not taken Greanias' age into account. Indeed, the situation here meets even the stringent "rare case" standard that is suggested by the dissenters in the en banc *Visser* decision (924 F.2d at 600–64).[17]

## McDONNELL DOUGLAS/BURDINE Indirect Method

To survive summary judgment under the alternative framework for testing employment discrimination, Greanias must be able to "danc[e] through the *McDonnell Douglas* quadrille" (*Shager*, 913 F.2d at 401). But there is no need to pursue that intricate analysis—as already explained, *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788 teaches that it is called for only when the adverse employment decision was caused by considerations that are either permissible *or* impermissible, and when the question is therefore as to which of those two categories was actually at work.

---

**17.** Nor is this a case in which this Court must fall back on what *Shager,* 913 F.2d at 403 describes as "the 'practical' test for summary judgment, which is whether the nonmovant has a fighting chance at trial." It really follows a fortiori from the analysis here that Greanias would fail *that* test.

Because this opinion has already found as a matter of law that Sears has *proved* that non-age-based reasons were a cause of Greanias' termination, the destination is inevitably the same whichever route is traveled:

1. If this Court indulges the pro-Greanias assumption (however doubtful) that his age was also a "substantial factor" in Sears' decision to fire him, the just-completed section of this opinion has found that Sears nonetheless prevails.

2. If however the non-age-based reasons were the *only* substantial factors leading to Greanias' termination, that is of course the end of the matter—it is wholly irrelevant to engage in the *production*-burden-shifting routine under *McDonnell Douglas/Burdine* where Sears has sustained its burden of *persuasion* as a matter of law.

There is thus no need to prolong the discussion by embarking on that alternative route.

### Conclusion

There is no genuine issue of material fact as to Greanias' claim that Sears violated ADEA by terminating him. Sears is entitled to a judgment as a matter of law. This action is dismissed.