Robert J. LUBECK, Plaintiff,

v.

COMET DIE AND ENGRAVING COMPANY, Defendant.

No. 93 C 544.

United States District Court,
N.D. Illinois, E.D.

March 28, 1994.

Jeanne M. Reynolds, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Robert Lubeck ("Lubeck") has sued Comet Die and Engraving Company ("Comet"), claiming that it discharged him because of his age (65 at the time of his dismissal) in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. Comet has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Comet's motion is granted and this action is dismissed with prejudice.

### Summary Judgment Standards

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While courts are generally reluctant to grant summary judgment "in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), summary judgment for Comet is nevertheless appropriate if the record reveals that no reasonable jury could conclude that Lubeck was fired because of his age (*Shager v. Upjohn Co.*, 913 F.2d 398, 399 (7th Cir.1990)).

### Facts [1]

Lubeck, born February 26, 1926 (D. 12(m) ¶ 1), began his career at Comet in June 1943

Arnold H. Landis, Chicago, IL, for plaintiff.

1. This District Court's General Rule ("GR") 12 facilitates the resolution of Rule 56 motions:

(a) GR 12(m) requires every Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts.

(b) GR 12(n) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

as an apprentice engraver (Lubeck Dep. 17–18). Except for the 1944–46 period when he served in the United States Navy, he worked continuously for the firm until he was fired on December 31, 1991 at the age of 65[2] (D. 12(m) ¶¶ 1, 18; Lubeck Dep. 15–17). In 1960 he had become foreman of the Engraving Department ("Department"), a position that he retained throughout his career with Comet (D. 12(m) ¶ 3; Lubeck Dep. 22, 24, 48).[3] By 1991 Department comprised Lubeck and three individuals under his supervision: 42-year–old Richard Malchiodi ("Malchiodi"), who was hired on May 11, 1972, 36–year–old Richard Cummings ("Cummings"), who was hired on October 4, 1976, and Edgar Pestano ("Pestano"),[4] who was hired on April 8, 1991 and fired on June 26, 1992 (D. 12(m) ¶¶ 25–28; Lubeck Aff. ¶ 10; Donlin Aff.Ex. A).[5]

Department's engraving work was of two types: free-hand mill work and work on pantograph machines. In the first type the engraver follows a "layout" made on the metal, free-hand as it were, hence the name for that type of engraving. In the second type of work the engraver creates a die by using a "stencil or pattern" (P. 12(n)(2) ¶ F; Lubeck Dep. 25).

Throughout Lubeck's tenure at Comet, at least the vast bulk of his work was on free-hand milling machines. By 1991 he appears to have been the only employee at Comet who did so full-time (D. 12(m) ¶¶ 18, 45; Lubeck Dep. 22; Donlin Aff. ¶¶ 4, 34).[6] Virtually all of his time was spent in performing that function and in supervising the others in Department, a duty that required "maybe two hours a day" (D. 12(m) ¶ 54; Lubeck Dep. 30, 40–41). While he had worked on pantograph machines "consistently" until 1970,[7] he worked on them just once or twice in 1990 and only occasionally in 1991 (D. 12(m) ¶ 30; Lubeck Supp.Aff. ¶ 9; Lubeck Dep. 30). Lubeck also said that he worked with cutter grinders (which were used with milling machines) "[j]ust about every day" but for "[l]ess than an hour" (Lubeck Dep. 33), that he operated surface grinders "[n]ot very often" in 1990 and 1991 (D. 12(m) ¶ 34; Lubeck Dep. 31) and that he "[p]ossibly" used Bridgeport grinders in 1990 but not in 1991 (D. 12(m) ¶ 34; Lubeck Dep. 32). Dur-

While Comet adhered to the requirements of GR 12, Lubeck's original counsel failed to do so. Lubeck's later-substituted counsel was granted an extension to file the requisite GR 12(n) statements. However, he then filed a GR 12(n)(1) statement that lacked any citations to the record, generally limiting itself to contesting Comet's GR 12(m) statement on the ground that the cited portions of the record do not support the facts asserted. This Court's independent review discloses that in most cases Comet's assertions are indeed properly supported by the record. References to Comet's GR 12(m) statement will take the form "D. 12(m) ¶—," while Lubeck's GR 12(n) response will be cited as "P. 12(n)(1) ¶—" and his statement of additional facts will be cited as "P. 12(n)(2) ¶—." Where P. 12(n) either explicitly or implicitly admits an assertion in D. 12(m), only the latter will be cited. Comet's reply to P. 12(n)(2) will be referred to as "D. 12(n) ¶—" for lack of a more appropriate designation.

2. All ages are given as of December 31, 1991.

3. In 1984 Lubeck gave up his position as foreman for six months (Lubeck Dep. 53–54), but that is irrelevant for purposes of Comet's motion.

4. All that is known of Pestano's age is that he is younger than Lubeck (P. 12(n)(2) ¶ R).

5. Earlier Department had also included a Mr. Knuerr and Mr. Hess, who respectively retired in 1989 and on April 1, 1991 (Donlin Aff.Ex. D).

6. That follows directly from Comet's evidence that:

   1. It had only one full-time free-hand mill operator in 1991 (Donlin Aff. ¶ 4).
   2. It told Lubeck it was firing him because the firm was eliminating one such worker (Donlin Aff. ¶ 34).
   3. Since Lubeck's firing, Comet has neither hired nor employed such a full-time worker (D. 12(m) ¶ 45).

7. Comet disputes that Lubeck worked on pantograph machines until 1970 as he claimed, citing deposition testimony of Pajak and Donlin. However, Pajak did not start working at Comet until 1978 (Pajak Dep. 7), and Donlin's testimony appears to refer to the jobs that Lubeck performed in the few years before his termination (Donlin Dep. 30–32). In any event, even if that deposition testimony had directly contradicted Lubeck, Lubeck as the nonmovant is entitled to the reasonable inference that he would know when he performed a certain job. Though Lubeck is of course an interested party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) teaches that Rule 56 motions are not the occasion for credibility determinations. This opinion will therefore credit Lubeck's version in that respect.

ing 1991 he operated no other machines in any other department (Lubeck Dep. 33–34).

In comparison, Malchiodi operated both pantograph and deckl machines, Cummings worked on both pantograph and free-hand mill machines (in the latter respect he filled Lubeck's place when the latter was on vacation) and Pestano ran pantograph machines (D. 12(m) ¶¶ 26–28; Lubeck Dep. 28). Department itself had 3 free-hand milling and 17 pantograph machines (D. 12(m) ¶ 56).

Until his last few years at Comet, Lubeck's employment was apparently uneventful and to the satisfaction of both parties.[8] But

starting in 1990 and continuing through 1991 Comet experienced a decline in the demand for free-hand mill work in particular (a decline that affected the entire engraving industry) and engraving work in general (D. 12(m) ¶ 14; Lubeck Dep. 26).

That downturn in business naturally generated less work for Comet's employees. That result is reflected in the "non-productive time" and overtime hours of the members of Department for 1990 and 1991, taken from Comet's payroll records and daily job cards (D. 12(m) ¶¶ 37–44; Donlin Aff. ¶¶ 6, 7; Donlin Aff.Exs. B, D–F)[9]:

| | Non-productive Time | | | | Overtime Hours | |
| | Hours | | Percentage of Total Hours Worked | | | |
| | 1990 | 1991 | 1990 | 1991 | 1990 | 1991 |
|---|---|---|---|---|---|---|
| Lubeck | 706.5 | 518.0 | 38.5% | 35.6%[10] | 15.0 | 0.0 |
| Malchiodi | 73.6 | 199.6 | 3.8% | 10.5% | 147.8 | 92.9 |
| Cummings | 101.7 | 365.2 | 5.0% | 18.1% | 253.4 | 139.9 |
| Pestano | — | 272.2 | — | — | — | —[11] |

Concerned with Lubeck's non-productive time, Donlin "reprimanded" him for his "lack of work" on one occasion in 1991 and told him that "he had to start running other machines or doing other things in the department" (D. 12(m) ¶ 15; Donlin Dep. 17–19; Donlin Aff. ¶ 29). Similarly, Pajak told Lubeck that there "wasn't enough free hand mill work to keep him busy" and that he

should find other things to do and other machines to run (D. 12(m) ¶ 17; Pajak Dep. 17–20).[12] However, Lubeck was never explicitly told that he would be fired if he did not find more work within the firm (P. 12(n)(2) ¶ O). Lubeck states that "I did my very best" "to find something else to do" (D. 12(m) ¶ 15; Lubeck Dep. 49). However, his only evidence to that effect is his testimony

8. Comet's President Terrence Donlin ("Donlin") and its Shop Superintendent Jerry Pajak ("Pajak") cannot remember ever reprimanding Lubeck for his free-hand mill work (Donlin Dep. 18; Pajak Dep. 21).

9. Lubeck contests the non-productive time figures on the ground that "[i]t is entirely unclear how" they are "computed" (P. 12(n)(1) ¶¶ 37–40) and the overtime hours on the ground that it is "irrelevant" (P. 12(n)(1) ¶¶ 43–44), although he admits his own overtime hours (P. 12(n)(1) ¶ 42). On the first point, it is uncontested that the figures are computed from records Comet keeps in the ordinary course of its business (Donlin Aff. ¶ 7), and Lubeck has offered nothing to doubt either the accuracy of those records or the computations made from them. As to the second point, the overtime worked by members of Department is relevant to Lubeck's contribution to Comet relative to others, and by extension to its reasons for firing him.

10. Lubeck was absent from work for 8½ weeks in 1991 due to a disability (Donlin Aff.Ex. E). That explains why his total non-productive hours decreased by nearly 27% from 1990 to 1991, while his non-productive hours as a percentage of his total hours decreased by only 2.9%.

11. Because of Pestano's April 8, 1991 hiring date, there are naturally no entries for him in 1990. Whether for that reason or otherwise, Comet has not calculated Pestano's non-productive time as a percentage of his total hours worked or his overtime hours, and the record does not contain his payroll records from which to make those calculations.

12. Although Lubeck P. 12(n)(1) ¶¶ 15 and 17 deny the assertions of Donlin and Pajak reflected in the preceding two sentences of the text, Lubeck makes no citation to the record as the basis for such denial. Because the uncontroverted record supports those assertions, they are deemed admitted.

about having seen if there were work that he could do in the "bench department" (Lubeck Dep. 49–50). As to his success on that front, he had "no idea" how much time he spent working there (Lubeck Dep. 50). Lubeck himself admits that in 1991 there were weeks where he was non-productive 4 to 5 hours of each day, and that he had more non-productive time than anyone else in Department (D. 12(m) ¶¶ 35, 36).

Pantograph machines must be used to create patterns in Comet's engraving process (D. 12(m) ¶ 52), and the company has about 50 such jobs a month (D. 12(m) ¶ 57).[13] Comet's pantograph log, which lists all jobs done on such machines, does not list Lubeck as having operated the pantograph machine at all (D. 12(m) ¶ 31; Donlin Aff. ¶ 21),[14] and neither Donlin or Pajak ever saw Lubeck operate the pantograph machine (D. 12(m) ¶¶ 32, 33). Donlin says that he had wanted Lubeck to do more pantograph work to reduce both Lubeck's non-productive time and the overtime worked by other Department members (D. 12(m) ¶ 58; Donlin Aff. ¶ 32).

In his defense Lubeck states that while he was given the "opportunity" to use other machines, the "work wasn't there" (Lubeck Dep. 62) and that he was never assigned specific tasks other than what he was already doing (P. 12(n)(2) ¶ M). Additionally, he claims that Comet had an oral policy that supervisors such as himself first had to assign work to members of their departments, so that where there is a shortage of work the supervisor is naturally left without any (P. 12(n)(2) ¶ H).[15]

Nevertheless, in early November 1991 Lubeck was told that he would be fired because Comet was eliminating one full-time free-hand mill operator (D. 12(m) ¶ 18; Lubeck Dep. 43). Comet never told Lubeck that he was being discriminated against because of his age (D. 12(m) ¶ 59).[16] Lubeck was fired on December 31, 1991 (D. 12(m) ¶ 18). Cummings has since become Department's foreman (D. 12(m) ¶ 46). Lubeck's position has not been replaced by the hiring of a full-time free-hand mill operator (D. 12(m) ¶ 45; Pajak Dep. 40).[17]

## Legal Framework

■ Under ADEA the employee always carries the burden of proving "that he would not have been discharged 'but for' his employer's motive to discriminate against him because of his age" (*Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir.1991)). This Court has had numerous occasions to discuss the approaches available for such a showing (see, e.g., *Berlett v. Cargill, Inc.*, 780 F.Supp. 560, 562–63, 567 (N.D.Ill.1991) and *Greanias v. Sears, Roebuck & Co.*, 774 F.Supp. 462, 472, 474–75 (N.D.Ill.1991)). This opinion will limit itself to a brief discussion of the alternatives, with lengthier references only to recent legal developments.

One approach is the "mixed-motives" analysis announced in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), applicable where an employee presents evidence showing[18] that both

---

**13.** Lubeck's P. 12(n)(1) assertion that he has no basis to admit or deny misunderstands the distinction between an answer—a court pleading under Rule 8(b)—and a GR 12(n) statement. It is the equivalent of an admission.

**14.** Lubeck objects that the log has not been attached as part of the record. However, Lubeck had an opportunity to complete discovery in this case—and if the log had indeed listed Lubeck, he could have objected on that ground and included the relevant pages, something he has not done.

**15.** Comet denies any such policy, but that too creates a credibility issue inappropriate for determination on summary judgment. Consequently Lubeck's version is accepted for purposes of this motion.

**16.** Lubeck fails to respond to that assertion, so it is deemed admitted (see n. 13).

**17.** Neither party has offered evidence on Department's precise overall makeup since Lubeck was fired.

**18.** Of course when a court rules on a motion for summary judgment nothing "has been shown," for the factual proofs have not been weighed by a trier of fact. Lubeck's burden on the current motion is merely to create a reasonable inference that could make that showing at trial (see *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994)). But it is awkward to frame Lubeck's burden repeatedly in such terms, an awkwardness compounded by the fact that so much of the case law (not necessarily written in the summary judgment context) speaks of what

discriminatory and non-discriminatory considerations have influenced an employer in making an adverse employment decision. And the other principal approach is of course the longer-established form of multi-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and reaffirmed in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). That approach, in contrast to *Price Waterhouse*, is used where "*either* a legitimate *or* an illegitimate set of considerations led to the challenged decision" (*Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788).[19]

Under either approach the prohibited discriminatory motive may be shown either by direct evidence of discriminatory intent or through the presentation of circumstantial evidence. Lubeck offers no such direct evidence,[20] so this opinion is called upon to examine the evidence that he tenders to create the inference that age discrimination was at work here (*Pilditch v. Board of Educ.*, 3 F.3d 1113, 1117–19 (7th Cir.1993)).

For that purpose it really does not matter whether the burden-of-persuasion shifting under *Price Waterhouse* or the burden-of-persuasion retention under *McDonnell Douglas–Burdine* is properly applicable here. After all, in the summary judgment context the burden of persuasion (used to decide which litigant wins if the evidentiary scales are in equipoise) is irrelevant, for the nonmovant must place on his, her or its side of the scales only enough evidence to permit a reasonable jury to return a verdict in the nonmovant's favor (*Anderson*, 477 U.S. at

248, 106 S.Ct. at 2510). Moreover, in this instance there is no need to repeat the familiar ping-pong steps in the *McDonnell Douglas–Burdine* analysis for reasons that will quickly become apparent in the next section of this opinion.

### Pretext Vel Non

This Court has recently observed in *Moore v. NutraSweet Co.*, 836 F.Supp. 1387, 1395 (N.D.Ind.1993) (quoting *Samuelson v. Durkee/French/Airwick*, 760 F.Supp. 729, 736 (N.D.Ill.1991), *aff'd* 976 F.2d 1111 (7th Cir. 1992)) that where an employer attempts to justify a termination on grounds of economic necessity, the plaintiff's prima facie showing called for under *McDonnell Douglas–Burdine* frequently cannot be analyzed "wholly discretely from the plaintiff's showing of pretext." Hence it becomes preferable to "collapse the inquiry and focus on the showing of pretext" (*id.*; see also *McCoy*, 957 F.2d at 372). Such bypassing of the first two steps of the *McDonnell Douglas–Burdine* inquiry is appropriate in light of (1) the intertwined nature of the prima facie case and the inquiry into pretext and (2) the facility with which an employer can meet its burden of articulating a legitimate, nondiscriminatory reason for the discharge (see, e.g., *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1390–91 (7th Cir.1990)).

Comet's stated reason for firing Lubeck is that a decline in business resulted in a lack of work sufficient to keep Lubeck fully employed between his job as a free-hand mill machinist and his foreman duties. Because that justification is clearly legitimate on its

---

the employee must "prove" or must "show." Whenever this opinion employs either of those "prove" or "show" locutions it should therefore be understood in terms of Lubeck's lesser burden of creating reasonable inferences, not of actually having to bear the burden of persuasion. This Court has applied that inference-creating burden throughout this opinion.

**19.** While both *Price Waterhouse* and *McDonnell Douglas–Burdine* address allegations of race discrimination in violation of Title VII, their methods of analysis are equally applicable to ADEA cases (see, e.g., the final chapter of the protracted *Oxman v. WLS–TV* litigation, 12 F.3d 652, 656–58 (7th Cir.1993)).

**20.** Lubeck effectively admits his inability to present that kind of "direct evidence" in his Dep. 12–13:

Q. Well, did anyone refer to your age as a reason for termination?
A. No.
Q. Did anyone refer to your age regarding the hiring of Mr. Pastano [sic] or Mr. Cummings?
A. No.
Q. What basis do you have for your suspicions then that age was a factor in Comet Die's hiring of these individuals to the discrimination of you?
A. I don't know why else I would get fired, what other reason.

face, this opinion need only focus on whether Lubeck has raised a genuine and material factual issue as to whether Comet's proffered reason is a pretext for the type of discrimination prohibited by ADEA.

Lubeck's responsive memorandum, filed by counsel who was later replaced by another lawyer, is one of the rare lawyer's products that fits the adjective as well as the noun "brief": It runs just two pages (and obviously advances few arguments in opposition to Comet's motion). Despite the possibility of waiver created by such a limited presentation, this Court has independently reviewed the record to determine whether any genuine and material issue calls for the denial of Comet's motion. What follows is a look at all of the evidence referred to in Lubeck's Memorandum, GR 12(n) statements, affidavits or deposition [21] that casts light on that question.

### 1. Was Lubeck Replaced by Cummings and Pestano?

Lubeck Mem. 2 argues that both Cummings *and* Pestano replaced him, implying that Comet's statement that it fired him due to a decline in business is false. That position is simply without merit.

When Lubeck was fired he was Comet's only full-time free-hand mill machinist, and it is undisputed that since then not only has Comet had no one doing that work on a full-time basis, but also the total volume of that work has not been enough to occupy the full time of an engraver.[22] That alone is enough to dispose of this facet of Lubeck's argument—neither Cummings nor Pestano nor both combined took over the labor (as opposed to the management) functions that Lubeck fulfilled at Comet.

Cummings did assume Lubeck's position as Department foreman, and while he does some free-hand mill work it is clearly not full-time: He continues to work on pantograph machines, and he also does layout and camera work (Pajak Dep. 38). Pestano never did free-hand mill work while Lubeck was at Comet, and there is no evidence that he did any after Lubeck was fired. Nor does Lubeck offer anything that suggests the later firing of Pestano on June 26, 1992 reflected any preferential treatment on account of his age [23]—and it is entirely consistent with Comet's explanation that it was facing a continuing decline in business that required the trimming of its labor force.

### 2. Should Cummings or Pestano Have Been Fired Instead?

Lubeck also contends that Cummings and Pestano should have been fired before he was considered for a similar fate. He bases that contention on his claimed ability to operate the pantograph machines and his assertedly superior skills and greater seniority than those of either of the other two men.

As to the first ground, Lubeck says that he was "capable of competently operating the pantograph machine" when he was fired (P. 12(n)(2) ¶ B) because (1) he supervised the other employees who worked on those machines and therefore must himself have had the requisite knowledge of their function (P. 12(n)(2) ¶ K) and (2) the pantograph machines in 1991 were the same ones that he had worked on "consistently" up until 1970 (P. 12(n)(2) ¶ J). As for the first point, it appears to be a non sequitur: Donlin himself has served as supervisor of the engraving department for a time, but he has never operated or been trained on the pantograph machine (Donlin Supp. ¶¶ 4–6). And as to the second point, it should be noted that Lubeck's earlier ability to work on the pantograph machines and the quality of that earlier work are not germane here (*Samuelson,* 976 F.2d at 1114 ("[a]n employee's past performance is not indicative of present performance")). What is relevant instead to the pretext inquiry is whether Lubeck "was meeting his employer's expectations *at the*

---

21. Lubeck offers no affidavit or deposition testimony other than his own in his opposition to Comet's motion.

22. This last fact is included to deal with the sometimes-encountered phenomenon of an employer's dividing up a departed employee's work among different employees just to make it appear that the former employee has not been "replaced."

23. Although Pestano's age is not in the record, it is known to be less than Lubeck's.

*time of the discharge"* (*Anderson v. Stauffer Chem. Co.,* 965 F.2d 397, 401 (7th Cir.1992) (emphasis in original)).

In that respect Lubeck claims that he was categorically more skilled than Pestano and that compared with Cummings he was more skilled in operating the free-hand machine and was just as skilled in "other tasks" (P. 12(n)(2) ¶¶ S–U). However, his "own self-interested assertions concerning [his] abilities are not in themselves sufficient to raise a genuine issue of material fact" that Comet's reason for his discharge is pretextual (*Williams v. Williams Elec., Inc.,* 856 F.2d 920, 924 (7th Cir.1988)). What controls instead is the "perception of the decision maker" (*Karazanos,* 948 F.2d at 337–38) and whether that decision maker "honestly believes in the reasons [he] offers" for the discharge (*McCoy,* 957 F.2d at 373). Consequently, on summary judgment an employer's personnel decisions are reviewed only to see that there was a genuine and honest effort to make them based on "performance-related considerations" (*Williams,* 856 F.2d at 924).

Donlin was the only decision maker. It was his belief that Pestano was "more skilled, qualified and productive than Mr. Lubeck in the operation of the pantograph machines" (Donlin Supp.Aff. ¶ 14; D. 12(n) ¶ S) and that Cummings was "more skilled, qualified and productive" than Lubeck generally (Donlin Supp.Aff. ¶ 13). Although Comet acknowledges that Cummings had less experience in supervising Department and in operating the free-hand mill machine (D. 12(n) ¶ T), it also points out that Cummings operated other machines and performed other functions that Lubeck did not (*id.*).

Because no court considering an employment discrimination case should "sit as a super-personnel department that reexamines an entity's business decisions" (*Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)), it is important to recognize that Comet legitimately viewed work on the pantograph machine as more vital to its future than free-hand mill work—as already stated, it is uncontroverted that the decline in demand that Comet was experiencing in the 1990–91 period was particularly marked in

the free-hand mill work area (D. 12(m) ¶ 14). It is also uncontested that Lubeck had worked on the pantograph machines only once or twice in 1990 and only occasionally in 1991, and that he spent the vast bulk of productive time during those two years supervising Department and working as a free-hand mill machinist, while Pestano and Cummings performed functions that Lubeck either did not do at all or did not do on a continuous basis.

In effect Lubeck is arguing that despite his near-complete lack of the most relevant work in comparison with that performed by Pestano and Cummings, Donlin should have divined that Lubeck actually had superior skills. But simply put, that counterintuitive argument cannot override the more logical conclusion that Donlin reached. Lubeck has offered nothing that would even remotely suggest that Donlin was not genuine in determining that Lubeck was less skilled than the other two, a determination that clearly supports his decision to discharge Lubeck before the other two.

As for Lubeck's attempted reliance on his greater seniority than Pestano and Cummings (P. 12(n)(1) ¶ 23; P. 12(n)(2) ¶¶ S, U), such seniority is irrelevant where the employer's decision to fire an employee is wholly based on other criteria (*Williams,* 856 F.2d at 924). Once again, Donlin decided to terminate Lubeck (1) because of the lack of sufficient free-hand mill work for a worker who was doing such work full-time and (2) because of his opinion that overall Lubeck was less skilled than either Pestano or Cummings.

Lubeck's emphasis on his comparative seniority essentially mischaracterizes the purpose of ADEA. That statute prohibits differential treatment ("discrimination") only when it is based on age, *not* just because the differential in treatment (which is not in fact motivated by the prohibited reason) may have a greater impact on an older employee (a proposition unanimously confirmed by the Supreme Court only last year in *Hazen Paper Co. v. Biggins,* —— U.S. ——, —— ——, 113 S.Ct. 1701, 1705–08, 123 L.Ed.2d 338 (1993)). Because seniority is so likely to

correlate to age (though it does not always do so), Lubeck's position would essentially undermine *Hazen Paper* by promoting the nonstatutory goal of guaranteeing individuals over the age of 40 preferential treatment over their younger co-workers (*Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1224 (7th Cir.1991) ("ADEA is not a tenure statute; a plaintiff must show that his age was the cause of his termination")).

Once again a court must always be mindful that it does not "sit as a super-personnel department" (*Dale*, 797 F.2d at 464, frequently quoted in such cases as *Konowitz v. Schnadig Corp.*, 965 F.2d 230, 233 (7th Cir. 1992)). Comet's decision to discharge Lubeck for legitimate business reasons rather than to be controlled by Lubeck's greater seniority does not indicate that those business reasons are either a pretext or that they somehow evidence an age-based animus. Thus the seniority issue also does not help Lubeck in his claim of an ADEA violation.

### 3. Was Lubeck Set Up?

Comet says that it fired Lubeck after he was unable or unwilling to find enough work at the firm to keep himself busy on a full-time basis. Lubeck responds that although Comet gave him the "opportunity" to use other machines, the "work wasn't there" (Lubeck Dep. 62) and that he was never assigned specific tasks other than what he was already doing (P. 12(n)(2) ¶ M). His implicit argument is that Comet's stated reason is somehow improper because he made an effort to reduce his non-productive time but the company failed to supply the work.

Clearly an employer cannot set an impossible task for an employee and then legitimately use the employee's inevitable failure to accomplish that task as a basis for discharge.

But it is undeniably proper for a company to fire employees when it no longer has sufficient work to justify their continued employment in an economic sense. Here Comet's economic problems are undisputed, and it is equally undisputed that before his termination Lubeck had a seriously disproportionate amount of non-productive time on his hands.[24] That he attempted but failed to find other things to do at the firm in no ways undermines the credibility of Comet's reason for his dismissal. If anything it reinforces the legitimacy of that reason, for Lubeck himself admits that he did not have enough work to keep him busy on a full-time basis. Companies are not in business to employ more workers than they need, and ADEA cannot be used to force them to do so.

No one at Comet specifically told Lubeck what work he should take on to fill up his working day. Lubeck also claims that Comet had an oral policy requiring supervisors (such as himself) first to assign work to their subordinates, so that when there was a shortage of work he was left without any (P. 12(n)(2) ¶ H).[25] But neither of those points aids Lubeck, because all aspects of company policy and actions other than age discrimination are beyond ADEA's reach—although this Court does not suggest that Comet merits any such pejorative characterizations, its success on the current motion follows a fortiori from the principle that (*McCoy*, 957 F.2d at 373 (brackets in original), quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.1987)):

> No matter how medieval a firm's practices, no matter how highhanded its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere.

It is irrelevant whether it was fair or sound business judgment for Comet (1) to

---

**24.** Lubeck asserts that around 75% of all the engraving work requires some free-hand mill work (Lubeck Dep. 25–26), while Comet says the actual portion is 25% (D. 12(m) ¶ 49). Even if Lubeck's version is credited via the favorable-inference route, the weasel word in that version is "some." It is undisputed that of the four people in the engraving department only one—Lubeck—spent a significant amount of time in free-hand milling work and that his full-time involvement in that activity still left him with by far the greatest amount of unproductive time.

Thus the claimed 75% of "some" such work reduces itself to a small—and diminishing—part of Department's total workload.

**25.** It should be said that Comet denies any such policy. But as with the few other factual disputes referred to in this opinion, that creates a credibility issue such that Lubeck's version must be accepted for purposes of Comet's Rule 56 motion.

have left it to Lubeck's own initiative to find additional work within the firm or (2) to have supervisors first assign work to subordinates. Neither of those elements casts any "doubt" on the "genuineness and honesty" of the reason that Comet has offered for firing Lubeck, so that neither raises a genuine issue that the stated reason is pretextual (see *Williams,* 856 F.2d at 924).

### Conclusion

There is no genuine issue of material fact to support a reasonable inference that Comet violated ADEA in terminating Lubeck. Comet is therefore entitled to a judgment as a matter of law. Its motion for summary judgment is granted, and this action is dismissed with prejudice.