John P. FEELEY, Plaintiff,

v.

BANK OF WAUKEGAN, Defendant.

No. 97 C 4207.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 25, 1998.

Terrance A. Norton, Chicago, IL, for Plaintiff.

Sigi M. Offenbach, Pitler and Mandell, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

John Feeley ("Feeley") has sued his ex-employer Bank of Waukegan ("Bank"), charging it with employment discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). Bank has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56, and the substantively inadequate nature of Feeley's response has obviated the need for Bank's reply (due to be filed on August 31).[1] For the reasons stated in this memorandum opinion and order, Bank's motion is granted and this action is dismissed with prejudice.

This is the type of employment discrimination action that should never have been brought—an action by a terminated employ-

---

1. Bank's General Rule ("GR") 12(M) statement is cited "B. 12(M) ¶—," and Feeley's GR 12(N) response is cited "F. 12(N) ¶—." Those "B." and "F." abbreviations are also used for the parties' other submissions.

ee who, in contending that he was let go *because* he was older, is unable to face the facts that he was let go because of wholly legitimate business reasons (in this instance more than one) that had nothing to do with his age. Even with Feeley given the benefit of the required reasonable favorable factual inferences, no rational factfinder could return a verdict in his favor. And under the standard common to Rule 56 and to Rule 50(a) (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), that compels a judgment in Bank's favor as a matter of law.

### Summary Judgment Principles

Familiar Rule 56 principles impose on Bank the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where (as here) a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Feeley was treated in a statutorily prohibited discriminatory fashion (see *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there). And as indicated earlier, the ensuing discussion demonstrates how that standard dooms Feeley's claims.

### Facts

Because Bank has set out the factual background of the dispute with appropriate fairness, this opinion attaches the three-page

*FACTUAL BACKGROUND* section of Bank's initial memorandum as an accurate depiction of the basic material facts of the case. And to avoid any potential concern lest that attachment might not give Feeley his due in terms of the favorable inferences to which he is entitled, what follows will identify his principal attempted quarrels with those facts.[2]

For example, Feeley urges (F.12(N) ¶ 6) that the statement by the then head of Bank's Trust Department David Murdoch ("Murdoch") that "if your progress does not continue, we will be forced to consider the termination of your services" does not indicate that Bank was then (in the fall of 1994) considering Feeley's termination because Murdoch used the word "will." That quibble is of no probative force, especially considering (1) that Feeley was effectively placed on probation at that time, (2) that his performance remained suspect thereafter (with the Trust Department continuing to sustain substantial losses through 1995) and (3) that in February 1996 Bank, the FDIC and the Illinois Commissioner of Banks and Trust Companies entered into a Memorandum of Understanding ("MOU," B. Ex. 16) that not only effectively put Bank's Trust Department on a probationary status of its own but also, in so doing, expressly questioned the "cost-effectiveness of the in-house investment officer [Feeley]."

In that last respect Feeley argues (F.12(N) ¶ 11) that he was mentioned on only (!) 6 of the 45 pages of the FDIC's January 5, 1996 report (B.Ex. 17) that triggered Bank's entry into the MOU with the regulatory authorities and that the report found "many problems in account and asset administration occurred due to confusion over responsibilities between the investment officer and the account administrator." Essentially Feeley urges that Bank's management, and not Feeley himself, was to blame for the existing problems. That same contention is repeated in varying fashion at F. 12(N) ¶¶ 12 and 13.

---

2. To the extent that the discussion in the text may not treat with every purported difference that has been advanced by Feeley, any such omissions are clearly nonmaterial (that is, non-outcome-determinative).

But the undoubted fact that the existing problems were not *solely* ascribable to Feeley, but were rather more broadly based, is really irrelevant in light of the facts (1) that Richard Block ("Block") was brought in during March 1996 as a new broom in response to the specific requirement in MOU ¶ 2 that Bank's Supervisory Committee (comprising three of its Board members) had to employ an independent outside consultant, (2) that less than three months later Block was hired by Bank as its Vice–President and Senior Trust Officer to run the Trust Department and (3) that Block's new broom swept very clean indeed—so that by 1997 not only Feeley but also Murdoch and all except one of the Trust Department's previously existing personnel were gone. And the clean sweep brought prompt results: a reevaluation of the Department in about September 1996 by the Illinois Commissioner found substantial progress, then as of April 4, 1997 FDIC also reexamined the Trust Department and found great improvement (causing it to upgrade Bank's rating) and—importantly—the Trust Department turned around to show a significant profit in 1997.

As a prime example of Feeley's irrelevant take on what are really undisputed facts, his counsel met the B. 12(M) ¶ 15 statement that "On March 3, 1996, Block recommended the termination of Mr. Feeley's employment in agreement with the MOU" with this response (F.12(N) ¶ 15):

> Plaintiff does not dispute the fact that Block recommended the termination of Feeley's employment, but he strongly disputes that this decision was "in agreement with the MOU." The MOU required that the independent consultant take into consideration 7 different areas. One of those was that the consultant consider, "cost effectiveness of an in-house investment officer." The MOU did not call for the termination of the in-house investment officer, but rather called for a consideration of the cost effectiveness of such an officer. (See Defendant's Exhibit 16).

But of course Feeley's essential problem is that after Block came on board and made his recommendations, Bank did indeed consider

Feeley's cost effectiveness, found it wanting and responded by terminating him (a step taken by Bank's President Fred Abdula on the basis of Block's express recommendation).

There is a good deal more that is set out in the part of Feeley's 12(N) Statement captioned *PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS,* but what Feeley portrays there are really a number of disagreements with the business judgments made by Bank. What controls here instead is that those disagreements are just that— quarrels about Bank's *business* judgments— and that nothing about them, even when viewed from the required pro-Feeley perspective together with the required favorable inferences, suggests that those decisions and judgments had anything to do with Feeley's age.

### Absence of Age Discrimination

Although at one point the dominant approach to analysis of employment discrimination cases was the ping-pong sequence spelled out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), more recent cases have emphasized the ultimate focus on the employer's intent: whether the same decision would have been reached if everything were the same except for the employee's age (*Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996) (per curiam)). Here Feeley loses whether the longer or the shorter route is taken.

In *McDonnell Douglas* terms, the second of the four essential elements of an employee or ex-employee's prima facie case, all of which are required to shift the burden of production (but not of persuasion) to the employer or ex-employer, is the need to show that the individual's job performance met the employer's legitimate expectations. In this instance there is nothing whatever to suggest that Block (who incidentally was age 51, well within ADEA's protected class [3]) was not entirely honest in stating his beliefs (1) that Feeley could have made himself more useful in the Trust Department and could have

---

3. Feeley was age 60 when Bank terminated him.

learned different functions or assisted in other areas, but (2) that Feeley made no such attempt and did not want to make himself more useful, or that Block was not equally sincere in his observation that Feeley spent most of his time with his feet on the desk reading periodicals. Although Feeley disputes that evaluation, the case law repeatedly stresses the controlling effect to be given to the employer's honestly-held perceptions (see, e.g., *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 890 (7th Cir.1997); *Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 676 (7th Cir.1997)).[4]

■ Still in the *McDonnell Douglas* mode, the fourth component of the prima facie case most frequently requires the employee to show that the employer sought a replacement for the terminated employee (*O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 310, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), quoting *McDonnell Douglas*)—something that is not at all involved here, where no new investment manager was hired in place of Feeley, but instead the functions previously carried out by Feeley were allocated among three employees who had primary functions elsewhere. In that respect the situation here is much like that addressed by this Court in granting summary judgment in favor of an employer in *Lubeck v. Comet Die & Engraving Co.,* 848 F.Supp. 783 (N.D.Ill.1994), where as here the job previously held by the terminated employee was never refilled and the work previously done by that employee was parceled out among other existing employees. And the situation does not call for the potential inferences spoken of in *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1331 (7th Cir. 1995) (a case to which Feeley refers, though it does not really support his position)—inferences that may be appropriate in quite different circumstances.

In the *McDonnell Douglas* variant where a reduction-in-force is involved, the fourth element requires a showing that other employees who are not in the protected class were treated more favorably than the complaining employee. That latter approach really does not fit here, where Block's evaluation—prompted by the MOU's having focused on the cost-effectiveness (or lack of it) of the investment manager position—was that no such separate role needed to be played in the Trust Department, and that the functions performed by Feeley could readily be divided among others with different primary responsibilities. This was not a situation, for example, where a RIF involved a downsizing (today's euphemism for wholesale firings) of an entire department, so that the question became which of several people would get the axe. Instead Bank's entirely permissible decision was to eliminate a position, and Feeley was the only one who held that position (see *Gadsby,* 71 F.3d at 1331–32, declining to apply RIF analysis to a single-discharge case). Once more the situation here is not the clay from which a claim of a difference in treatment based on age can be molded.

■ To shift to the ultimate-question approach of employer intent (see *Carson*), nothing in the record could rationally support a determination that any difference in Block's (and hence Bank's) decision would have been made if every element had remained the same except that the person holding Feeley's position and conducting himself or herself in the same manner had been under age 40.. And again that inexorably compels the conclusion that no age discrimination was at work here.

### Conclusion

From any perspective it is plain that there is no genuine issue of material fact here, and that Bank is accordingly entitled to a judgment as a matter of law. This action is dismissed with prejudice.

### FACTUAL BACKGROUND

The Bank found it necessary to terminate Mr. Feeley's employment for solely financial reasons which were totally unrelated to his age. The Trust Department of the Bank went

---

**4.** This paragraph of the text has tended to merge the second element of the prima facie case with the final step in the *McDonnell Douglas* approach: the lack of pretext in the employer's asserted reason for making the adverse employment decision. But that is not at all unusual, for the cases regularly do just that in this type of situation.

from managing assets of almost $46 million in 1993 to just over $15 million in 1996. (Defendant's 12(m) Statement of Undisputed Material Facts at paragraphs 9 and 10, hereinafter referred to as "12(m)"). The Trust Department's expenses exceeded its income from 1993 through 1995. (12(m) at par. 10). Something had to be done to return the Trust Department to profitability.

In fact, the Regional Director of the Federal Deposit Insurance Corporation ("FDIC") and the Illinois Commissioner of Banks and Trust Companies ("Commissioner") issued a Memorandum of Understanding on January 5, 1996 due to the what they deemed "unsatisfactory practices and conditions of the Bank's Trust Department." (12(m) at pars. 11, 12 and 13). One of their critical recommendations was to question the "cost effectiveness of the in-house investment officer." (12(m) at par. 13). That in-house investment officer was the Plaintiff, Mr. Feeley.

As the in-house investment officer, Mr. Feeley had the responsibility for investing trust funds held in the Bank in stocks, bonds and other securities. The Bank no longer needed this type of investment officer as the Trust Department managed barely one-third of the assets in 1996 as it did in 1993 and the remaining assets were primarily invested in mutual funds such as the Manager's Funds. (12(m) at par. 8). Even according to Mr. Feeley's own admissions, his duties as investment officer in the Trust Department did not keep him busy. (12(m) at par. 7).

In accordance with the Memorandum of Understanding entered into by the Bank, the FDIC and the Commissioner, the Bank hired Richard Block, in March of 1996, as an independent consultant for the Trust Department. (12(m) at par. 3 and 14). In his Memo of March 8, 1996, Mr. Block recommended the termination of Mr. Feeley's employment in agreement with the Memorandum of Understanding. (12(m) at par. 15). In accordance with Block's Memo, the Trust Department terminated Mr. Feeley's employment on May 3, 1996 for the stated reason of lack of work. (12(m) at par. 16).

The Bank hired Paul Veatch not to replace Mr. Feeley, but as an employee benefits specialist whose main objective was to attract employee benefit plans to the Trust Department. (12(m) at pars. 18 and 19). The Bank never has hired a new investment manager, but rather divided Mr. Feeley's duties of investing among the new manager, Mr. Block, and others in the Department. (12(m) at par. 20).

Mr. Block's duties were to return the Trust Department to profitability and to eliminate the many violations in the Trust operations cited by the FDIC and the Commissioner. The Bank hired Mr. Block as the new head of the Trust Department on May 20, 1996. (12(m) at par. 3). Mr. Block, in accordance with the Memorandum of Understanding, suggested the elimination of the position of in-house investment officer, Mr. Feeley, obtained the services of an employment benefits manager, Mr. Veatch, and terminated the employment of David Murdoch, the former head of the Department, in order to revive the Bank's Trust Department and bring in the needed revenue which the Trust Department needed to survive. Of the eight members of the Trust Department of the Bank who were there on January 1, 1996, only one was left at the end of 1997. (12(m) at par. 22). Mr. Block's total reorganization of the Department, including the elimination of Mr. Feeley's position, resulted in a vast improvement of the Trust Department. The Commissioner and the FDIC both reexamined the Trust Department and found great improvement. (12(m) at pars. 23 and 24). The Trust Department returned to profitability in late 1996 and in 1997 the Trust Department declared a significant profit. (12(m) at par. 25).

Instead of being shut down by the FDIC and the Commissioner, Mr. Block was successful in reorganizing the personnel in the Department, eliminating Mr. Feeley's position, returning the Trust Department to profitability and eliminating the many serious violations cited by the Commissioner and the FDIC. These actions reflect a clear and legitimate business necessity which belie any innuendo or allegation of discrimination.